**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**HUNTINGTON DIVISION**

**DAVID KEITH ADAMS,**

      **Petitioner,**

**v.**                              **Case No. 3:06-cv-00382**

**DAVID BALLARD, Warden,
Mount Olive Correctional Complex,**

      **Respondent.**

### PROPOSED FINDINGS AND RECOMMENDATIONS

Pending before the Court is Petitioner's Petition and Amended Petitions (collectively referred to as "petition") for Writ of Habeas Corpus by a Person in State Custody Under 28 U.S.C. § 2254, (Docket Nos. 1, 4, 34 and 34-1), and Respondent's Motion for Summary Judgment (Docket No. 41). This matter is assigned to the Honorable Robert C. Chambers, United States District Judge and, by Standing Order, has been referred to the undersigned United States Magistrate Judge for the submission of proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B).

David Keith Adams ("Adams") brings this petition for a writ of habeas corpus under 28 U.S.C. § 2254 following his 1999 convictions in the Circuit Court of Wayne County, West Virginia for the kidnapping and sexual assault of S.B. ("the victim"). Adams presently is incarcerated at Mount Olive Correctional Complex, serving a sentence of ten to twenty-five years imprisonment to be followed by a sentence of life imprisonment with mercy. In support of his petition, Adams raises one ground of

ineffective assistance of counsel; one evidentiary ground; one ground of newly discovered evidence justifying a new trial; and a final ground charging that his disproportionately harsh sentences violate the prohibition against cruel and unusual punishment contained in the Eighth Amendment of the United States Constitution. (*See* Docket No. 34 and 34-1).

As a preliminary matter, the undersigned notes that the record before the Court is well-developed and provides a sufficient basis upon which to resolve this case without need for an evidentiary hearing. *See* Rule 8, Rules Governing Section 2254 Cases. After thorough consideration of the record, the undersigned conclusively **FINDS** that Adams is not entitled to the relief requested. Therefore the undersigned **RECOMMENDS** that the presiding District Judge grant Respondent's motion for summary judgment and dismiss Adams' petition for a writ of habeas corpus.

## I.   <u>Factual History</u>

On the evening of August 23, 1998, Adams and the victim met at a Huntington bar named The Raging Bull.[1] After drinking and dancing, the pair left the bar together and ultimately arrived at the residence of Angela Walker, an acquaintance of Adams. There, Adams and the victim continued to drink, shared marijuana, and socialized with the people present at the residence. At some point during the night, Adams left to buy beer. While he was gone, Ms. Walker informed the victim that Adams was married and had children. When Adams returned from buying beer, the victim asked him to take her home. After remaining at the residence a little while longer, Adams

---

[1] The facts are taken largely from Adams' Amended Petition for Writ of Habeas Corpus by Person in State Custody under 28 U.S.C. § 2254, (Docket No. 34 and 34-1), and portions of the trial transcript. (Docket Nos. 41-2, 41-3, and 41-4).

and the victim left in the early morning hours of August 24, 1998. Both Adams and the victim testified at trial that after leaving the Walker residence, they drove to Kentucky where they engaged in sexual intercourse. They also agreed that after leaving Kentucky, they returned to West Virginia and drove to a cemetery in Wayne County. During the drive, the victim performed oral sex on Adams, and they once again engaged in sexual intercourse while at the cemetery. Adams and the victim further agreed that they spent several hours at the cemetery; Adams removed trash from his vehicle and left it at the cemetery; and they drove through a tobacco store drive-thru before the victim was taken home. Approximately three weeks later, on September 12, 1998, the victim appeared at Adams' home and confronted his wife. The victim told Mrs. Adams that Adams had raped her. The victim asked to see the interior of Adams' car, including the trunk. Mrs. Adams allowed the victim to inspect the vehicle. Later that afternoon, State Police officers arrived at the Adams' residence and impounded the vehicle. They advised Mrs. Adams that the victim had accused Adams of kidnapping and raping her.

In November 1998, a Wayne County Grand Jury indicted Adams on charges of kidnapping and sexual assault in the second degree. (Docket No. 8-1 at 2-3). His trial began on May 12, 1999. On the first day of trial, the victim told the following story: She became acquainted with Adams on the night in question at The Raging Bull. She spent time drinking and dancing with him and around 1:00 a.m. agreed to accompany him to the Walker residence. While at the residence, she learned that Adams was married and, not wanting to become involved with a married man, she asked him to take her home. After leaving the Walker residence with Adams, the victim was taken against her will to a construction site along the interstate in

Kentucky. There, Adams sodomized her and then threatened to kill her. According to the victim, after raping her, Adams drove off and left her along the side of the interstate. However, some time later, he returned and ordered her to get back into the car. Fearing for her life, she complied. When Adams began driving further into Kentucky, the victim begged him to take her back to West Virginia. He told her that he would take her home if she agreed to perform oral sex on him. In order to get home safely, the victim complied. Instead of taking her home, Adams took the victim to a cemetery in Wayne County, where he continued to assault and threaten her. The victim testified that she begged for her life, but Adams was not moved by her pleas. At one point, Adams emptied the contents of the victim's purse onto the ground, looking for money to help him escape to Florida. The victim testified that during her ten-hour ordeal Adams pulled out patches of her hair, raped her repeatedly in his vehicle, tied her hands together with a shirt, and ordered her to get into the trunk of the car. He told the victim that he was going to kill her to prevent her from reporting him to the police. Once in the trunk, the victim yanked at wires and tore the weather stripping in an effort to disengage the tail lights and attract the attention of the police. While she was in the trunk, Adams threatened to set the car on fire. He also backed into a tree or some other object, causing damage to the bumper and trunk. Ultimately, Adams let the victim out of the trunk. He told her he had changed his mind about killing her, took her to a drive-thru to buy cigarettes, and dropped her off at a truck stop near her home. The victim did not immediately report the assault to the police, because she continued to fear for her life. However, she finally decided, with the help of a male friend, to retrace the route Adams had taken that night. She located the Walker residence and spoke with Angela Walker. The victim subsequently went to the Adams'

residence to speak with his wife and confirm that the vehicle still showed damage to the bumper and trunk from the collision, as well as the damage the victim inflicted on the interior while locked in the trunk. After inspecting the vehicle, the victim decided to report the crimes to the police.

Adams also testified at trial and refuted the victim's story. According to Adams, he first met the victim when she approached him at The Raging Bull and asked him to dance. After initially refusing her advances, he finally relented and danced and drank with her. When the bar closed around 3:00 a.m., he and the victim left together and went to the victim's home so that she could retrieve marijuana. They then drove to Walker's trailer to continue the party. After leaving the trailer later that morning, the victim told Adams about a place she knew in Kentucky. They drove to a construction site along the interstate and had consensual sexual intercourse. From there, Adams and the victim drove to a cemetery near Prichard, another place known to the victim. During the drive, the victim voluntarily performed oral sex on Adams. Once at the cemetery, Adams and the victim sat and talked, drank more beer, and smoked marijuana. The victim told Adams about a beach front home she had previously owned in Florida and urged him to move there with her, indicating that he would be a good father to her children. She implied that she had money and could take care of him. Adams accepted $200 from the victim and agreed to go with her to Florida. At some point during their stay at the cemetery, Adams cleaned trash out of his car and the couple once again engaged in consensual sexual intercourse. They spent the morning in the cemetery and in the early afternoon, Adams took the victim home. On the way, he stopped at a drive-thru convenience store, named Stogie's, so that the victim could buy a pack of cigarettes and drove through a Burger King, so

that she could get a soft drink. He denied threatening or harming the victim and further denied ordering her to get into the trunk of his car. When confronted with photographs showing damage to his car's rear bumper and the interior of the trunk, Adams testified that the damage to his vehicle was present before August 24, 1998 and occurred when he and his wife used the car to move furniture. Adams reiterated that his sexual relations with the victim were entirely consensual. He contended that the victim later accused him of rape, because he reneged on his agreement to leave his wife and accompany the victim to Florida.

## II.    Procedural History

On May 13, 1999, a Wayne County jury found Adams guilty of kidnapping and second degree sexual assault. (Docket No. 8-1 at 5-6). The kidnapping conviction carried a statutory mandatory life sentence, but allowed for a jury recommendation of mercy. After a second phase of trial, the jury deliberated and unanimously recommended mercy. (*Id.*). Adams was sentenced on July 16, 1999. (Docket No. 41-4 at 61-87). The victim was permitted to make a statement and essentially asked for the maximum sentence. After considering Adams' criminal history, which included five misdemeanor and four felony convictions; the nature of the crimes; and Adams' apparent lack of remorse, the trial judge sentenced Adams to ten to twenty-five years imprisonment on the sexual assault conviction, to be served first, followed by life imprisonment with mercy on the kidnapping conviction. (*Id.*). Adams was re-sentenced to the same terms of imprisonment by Order entered January 3, 2000 to account for a delay in the preparation of the trial transcript for appeal. (Docket No. 8-1 at 11-12).

On May 18, 2000, Adams filed a Petition for Appeal and Writ of Error to the Supreme Court of Appeals of West Virginia ("WV Supreme Court"). (Docket No. 8-1 at 14-29). He argued that (1) the evidence at trial was insufficient to support the verdict; (2) inflammatory and prejudicial evidence was erroneously admitted; (3) the evidence, at best, supported an abduction charge, but not a kidnapping charge; and (4) the cumulative effect of the errors deprived Adams of a fair trial. (*Id.*). By Order entered September 19, 2000, the WV Supreme Court refused to hear the appeal. (Docket No. 8-1 at 31).

On October 24, 2000, Adams filed a Petition under W.Va. Code § 53-4A-1 for Writ of Habeas Corpus in the Circuit Court of Wayne County, West Virginia. (Docket 8-2 at 2-35). Adams alleged the following grounds:

(1)    Ineffective assistance of counsel;
(2)    Insufficient evidence to support the convictions;
(3)    Erroneous introduction of inflammatory and prejudicial evidence;
(4)    The evidence viewed in the light most favorable to the prosecution, at best, supported abduction, but not kidnapping;
(5)    His sentences were disproportionately harsh;
(6)    Erroneous failure to grant motion for acquittal;
(7)    The cumulative effect of errors denied him a fair trial; and
(8)    Miscellaneous errors.

(*Id.*) After conducting three hearings on the petition,[2] which included testimony from Adam's trial counsel, Mr. Gregory Smith ("Smith"), as well as other witnesses, the Circuit Court entered an Order on December 1, 2004 denying the Petition for Writ of Habeas Corpus. (Docket No. 8-3 at 42-55). Accordingly, Adams filed a Petition for

---

[2] On May 14, 2001, after the Circuit Court's initial review of the Petition for Writ of Habeas Corpus, Adams filed a second Petition, which was substantively similar to the first Petition, but was intended to clarify his contentions. The Circuit Court consolidated the Petitions in one action. (Docket No. 8-3 at 39-40). The Court also appointed counsel to represent Adams in the post-conviction proceedings. (Docket No. 8-3 at 42).

Writ of Error to the WV Supreme Court on August 1, 2005, (Docket No. 8-4 at 2-49), arguing that the habeas court's ruling was erroneous.[3] The WV Supreme Court summarily refused the appeal on November 3, 2005. (Docket 8-4 at 51).

Adams then filed a Petition pursuant to 28 U.S.C. § 2254 in the United States District Court for the Southern District of West Virginia on May 18, 2006, alleging the following five (5) grounds:

(1)    Ineffective assistance of counsel;
(2)    Erroneous admission of 404(b) evidence;
(3)    Newly discovered evidence justifying a new trial;
(4)    Insufficient evidence to support the convictions; and
(5)    Imposition of disproportionately harsh sentences in violation of the Eighth Amendment of the U.S. Constitution.

(Docket No. 1). Respondent moved to dismiss the petition on July 8, 2006, arguing that Adams had failed to exhaust his state remedies on a portion of the asserted grounds. (Docket No. 8). On November 13, 2007, Adams moved for an order staying the action to allow him an opportunity to exhaust his state remedies. (Docket No. 19). This Court granted the Motion to Stay on September 30, 2009. (Docket No. 24). Adams filed a third Petition for Writ of Habeas Corpus in the Circuit Court of Wayne County on October 29, 2009. (Docket 41-1 at 2-44). The Circuit Court entered an Order on December 29, 2009 dismissing the action. (Docket No. 41-1 at 46-86). Adams filed a Petition for Appeal with the WV Supreme Court, which the Court refused on June 22, 2010. (Docket No. 41-1 at 112).

On July 1, 2010, the stay in the instant action was lifted, and Adams was given

---

[3] In addition to the grounds previously raised by Adams, he also argued that his trial counsel had a conflict of interest; that newly discovered evidence should have been considered by the state habeas court; and that there were prejudicial procedural errors committed by the habeas court in the manner in which it conducted the omnibus hearings.

until August 27, 2010 in which to file an amended petition for habeas relief. (Docket Nos. 26 and 36). On November 10, 2010, Respondent filed a Motion for Summary Judgment seeking dismissal of the petition. (Docket No. 41). Adams filed a response to the Motion for Summary Judgment. (Docket No. 43). The time for filing additional memoranda has expired; therefore, this matter is ready for resolution.

### III.  **Standard of Review**

#### A.  **Motion for Summary Judgment**

Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Motions for summary judgment impose a heavy burden on the moving party; for, it must be obvious that no material facts are in dispute and no rational trier of fact could find for the nonmoving party. *Miller v. Federal Deposit Ins. Corp.,* 906 F.2d 972, 974 (4th Cir. 1990).

Nonetheless, the "mere existence of a scintilla of evidence" favoring the nonmoving party will not prevent entry of summary judgment. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252 (1986). While any permissible inferences to be drawn from the underlying facts must be viewed in the light most favorable to the party opposing the motion, *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587-88 (1986), "[i]f the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Felty v. Graves-Humphreys Co.,* 818 F.2d 1126, 1128 (4th Cir. 1987). In the instant action, Respondent has filed a motion for summary judgment and asserts that the facts material to disposition are not in

dispute. In response, Adams does not allege the existence of disputed facts; instead, he contends that the documents before the Court provide convincing and conclusive proof that he is entitled to a writ of habeas corpus. From independent review, the undersigned finds that the record is adequate and agrees that no genuine issues of material fact exist between the parties. The issues in controversy are either matters of law or challenges to the state court's application of controlling federal precedent to the undisputed facts; consequently, resolution by summary judgment is appropriate.

### B.   Petitions Seeking Habeas Relief Under § 2254

28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 (hereinafter "AEDPA"), Pub.L. No. 104-132, 110 Stat. 1214, authorizes a federal district court to entertain a petition for habeas corpus relief from a prisoner in State custody, "on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Subsection (d) of § 2254 provides that an application for writ of habeas corpus by a person in State custody "shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim" is:

  (1) contrary to, or involves an unreasonable application of clearly established Federal law, as determined by the Supreme Court of the United States; or

  (2) based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.

28 U.S.C. § 2254(d)(1) and (2); *see also Williams v. Taylor,* 529 U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). When reviewing a petition under § 2254, the federal court uses "a highly deferential lens." *DeCastro v. Branker,* 642 F.3d 442, 449 (4th Cir. 2011). As such, factual determinations made by the state court are presumed to

be correct and are only rebutted upon presentation of clear and convincing evidence to the contrary. 28 U.S.C. § 2254(e)(1).

The "contrary to" and "unreasonable application" clauses of § 2254(d)(1) have independent meanings. *Williams,* 529 U.S. at 405. A federal court may grant habeas relief under the "contrary to" clause "if the state court arrives at a conclusion opposite to that reached by [the United States Supreme] Court on a question of law or if the state court decides a case differently than the [United States Supreme] Court has on a set of materially indistinguishable facts." *Lewis v. Wheeler*, 609 F.3d 291, 300 (4th Cir. 2010) (citing *Williams,* 529 U.S. at 413). A habeas writ may be granted under the "unreasonable application" clause "if the State court identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case." *Lewis v. Wheeler*, 609 F.3d 291 at 300–01 (citing *Williams,* 529 U.S. at 413). A federal court may not issue a writ under this standard "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather the application must also be unreasonable." *Williams*, 529 U.S. at 411. As discussed in greater detail in the Analysis section, *infra,* the standard of review under the § 2254 unreasonable application clause in the context of an ineffective assistance of counsel claim is considerably more focused and emphasizes the deference given to a state court's determinations under *Strickland. See Harrington v. Richter,* _ U.S. _, 131 S.Ct. 770, 778, 178 L.Ed.2d 624 (2011).

## IV.   <u>Analysis</u>

### A.      Ineffective Assistance of Counsel

The Supreme Court has long held that the Sixth Amendment of the United States Constitution provides each criminal defendant with "the right to the effective assistance of counsel." *Strickland v. Washington,* 466 U.S. 668, 686, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). While assistance "which is ineffective in preserving fairness does not meet the constitutional mandate," *Id.* at 685-86, "defects in assistance that have no probable effect upon the trial's outcome do not establish a constitutional violation." *Mickens v. Taylor,* 535 U.S. 162, 166, 122 S.Ct. 1237, 152 L.Ed.2d 291 (2001).

In *Strickland*, *supra*, the Supreme Court adopted a two-prong test for determining whether a criminal defendant received ineffective assistance of counsel. A defendant must show (1) that counsel's representation fell below an objective standard of reasonableness and (2) that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Strickland*, 466 U.S. at 687-91. "[J]udicial scrutiny of counsel's performance must be highly deferential." *Id.* at 689. Counsel's performance must be assessed with "a context-dependent consideration of the challenged conduct as seen from counsel's perspective at the time . . . ." *Wiggins v. Smith,* 539 U.S. 510, 523, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003). In evaluating whether counsel's performance was deficient, "[i]t is all too tempting for a defendant to second guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable." *Wiggins*, 539 U.S. at 523. Hence, "court[s]

must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance ... [and] that, under the circumstances, the challenged action might be considered sound trial strategy." *Id.* (internal quotation marks omitted). "The question [under *Strickland*] is whether an attorney's representation amounted to incompetence under prevailing professional norms, not whether it deviated from best practices or most common custom." *Harrington,* 131 S.Ct. at 778.

Similarly, in evaluating whether the defendant has shown actual prejudice from any such deficient performance, "[p]etitioner must show that 'counsel made errors so serious that counsel was not functioning as the counsel guaranteed ... by the Sixth Amendment.'" *DeCastro,* 642 F.3d at 450 (citing *Harrington,* 131 S.Ct. at 778). It is insufficient for the defendant "to show that the errors had some conceivable effect on the outcome of the proceeding," because "[v]irtually every act or omission of counsel would meet that test." *Id.* at 693. Rather, a "reasonable probability" that the result would have been different requires "a probability sufficient to undermine confidence in the outcome." *Id.* at 694. When challenging a conviction, "the question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." *Id.* at 695.

In a § 2254 proceeding, however, the standard of review in the context of an ineffective assistance of counsel claim differs from the standard applied in the direct review of a *Strickland* challenge. *Harrington,* 131 S.Ct. at 778. As the Supreme Court explained, "[t]he standard created by *Strickland* and § 2254(d) are both 'highly deferential' ... when the two apply in tandem review is 'doubly' so."  *Id.* at 788. Instead of asking whether defense counsel's performance fell below an objectively

reasonable standard, the federal reviewing court must determine "what arguments or theories supported, or could have supported the state-court decision; and then ask whether it is possible fair-minded jurists could disagree that those arguments or theories are inconsistent with a prior decision of [the United States Supreme] Court." *Id.* "A state court's determination that a [*Strickland*] claim lacks merit **precludes** federal habeas relief so long as 'fair-minded jurists could disagree' on the correctness of that decision." *Id.* at 786-787, (citing *Yarborough v. Alvarado,* 541 U.S. 652, 664, 124 S.Ct. 2140, 158 L.Ed.2d 938) (emphasis added). "The question under § 2254(d) is not whether counsel's actions were reasonable, but whether there is any reasonable argument that counsel satisfied *Strickland's* deferential standard." *Id.*

Accordingly, to succeed on an ineffective assistance of counsel claim under § 2254, a petitioner must demonstrate more than an incorrect application of *Strickland* by the state court. Rather, the petitioner must show that the state court applied *Strickland* to the facts in an objectively unreasonable manner. *See Bell v. Cone*, 535 U.S. 685, 698-99 (2002). "Even a strong case for relief does not make the state court's contrary conclusion unreasonable." *Harrington,* 131 S.Ct. at 786. Applying this more explicit standard of review and considering in turn the nine categories of ineffective assistance of counsel alleged by Adams, the undersigned **FINDS** that Adams fails to meet his burden to establish that the state court unreasonably applied *Strickland* to the facts of his case.

### 1.    *Conflict of Interest*

Adams alleges that his trial counsel, Smith, "labored under an actual and prejudicial conflict of interest, which was not disclosed to the Petitioner prior to trial." (Docket No. 34 at 12). In particular, Adams contends that after he was charged

with the crimes for which he was convicted, but before his indictment and trial, the Assistant Prosecuting Attorney (hereinafter referred to as "Morgan") who represented the State at Adams' preliminary hearing left the Prosecuting Attorney's office and became employed as an Assistant Public Defender in the same office as Smith. (*Id.*). As a result, Adams was represented "by an attorney whose law firm, in this case the public defender's office, had a member with a knowledge of the prosecution's case, and, thus, a bias to believe that Petitioner's case was less than it might have been." (*Id.* at 15). According to Adams, this bias was clearly demonstrated by the "deplorable conduct exhibited by the Petitioner's trial counsel at trial and sentencing." (*Id.* at 16).

To the contrary, Respondent argues that Adams is unable to substantiate the existence of a conflict of interest in light of testimony that Morgan intentionally avoided involvement in Adams' defense, creating a "Chinese Wall" between himself and Smith on every criminal matter in which Morgan had participated before joining the Public Defender's office. (Docket No. 42 at 21). Moreover, Respondent emphasizes that Adams fails to specifically demonstrate how the purported conflict of interest compromised Smith's representation. (*Id.*).

One exception to the requirement that a defendant must establish both prongs of the *Strickland* test is where "assistance of counsel has been denied entirely or during a critical stage of the proceeding" or in other "circumstances of that magnitude." *Mickens,* 535 U.S. at 166. In these cases, the prejudicial effect on the outcome of the proceedings is presumed. *Id.* The Supreme Court of the United States ("Supreme Court") has also recognized that "circumstances of that magnitude" may occur "when the defendant's attorney actively represented conflicting interests." *Id.*

The most common scenario in which an attorney's conflict of interest is presumed to have undermined the integrity of the outcome is when a defense attorney simultaneously represents two or more defendants with conflicting interests in the same criminal prosecution. *See Holloway v. Arkansas,* 435 U.S. 475, 98 S.Ct. 1173, 55 L.Ed.2d 426 (1978). In *Holloway*, the Supreme Court found that an automatic reversal of the judgment was justified inasmuch as "[j]oint representation of conflicting interests is suspect, because of what it tends to prevent the attorney from doing." *Holloway*, 435 U.S. at 489. The Court explained:

> Generally speaking, a conflict may also prevent an attorney from challenging the admission of evidence prejudicial to one client but perhaps favorable to another, or from arguing at the sentencing hearing the relative involvement and culpability of his clients in order to minimize the culpability of one by emphasizing that of another. Examples can be readily multiplied. The mere physical presence of an attorney does not fulfill the Sixth Amendment guarantee when the advocate's conflicting obligations have effectively sealed his lips on crucial matters.

*Id.* at 489-90.

Nonetheless, the Supreme Court declined to extend the automatic reversal rule of *Holloway* to all cases in which defense counsel had a potential conflict of interest. *Mickens,* 535 U.S. at 168. Instead, the Court clarified that a defendant must first show an actual conflict of interest; that being, a conflict which had an adverse effect on the performance of counsel "as opposed to a mere theoretical division of loyalties." *Mickens,* 535 U.S. at 171. Once a defendant shows that the conflict of interest "actually affected the adequacy" of his counsel's representation, then he "need not demonstrate prejudice in order to obtain relief." *Id.* (*citing Cuyler v. Sullivan,* 446 U.S. 335, 349-50, 100, S.Ct. 1708, 64 L.Ed.2d 333 (1980)).

To show that a conflict of interest actually affected counsel's performance, the defendant "must satisfy, by a preponderance of the evidence, the three-part standard established in *Mickens v. Taylor*." *United States v. Nicholson,* 611 F.3d 191, 197 (4th Cir. 2010). Citing to *Mickens* and the Court's prior decision in *Nicholson I,* 475 F.3d 241, 252 (4th Cir. 2007), the Fourth Circuit Court of Appeals explained defendant's burden as follows:

> He must, first of all, 'identify a plausible alternative defense strategy or tactic that his defense counsel might have pursued.' Second, he must establish that 'the alternative strategy or tactic was objectively reasonable under the facts of the case known to the attorney at the time of the attorney's tactical decision.' In order to satisfy this second prong, 'the [defendant] must show that the alternative strategy or tactic was 'clearly suggested by the circumstances.' Lastly, he must show that 'the defense counsel's failure to pursue that strategy or tactic was linked to the ... conflict.' In establishing these three aspects of this test, the [defendant] is not required to show that the strategy or tactic not taken would have been successful, but only that it would have been objectively reasonable.

*Nicholson,* 611 F.3d at 197 (internal citations omitted).

Here, the undersigned notes that the state habeas court expressly found that Morgan had no participation in Adams' defense. (Docket No. 8-3 at 52). This finding of fact is afforded a presumption of correctness unless it is rebutted by clear and convincing evidence. 28 U.S.C. § 2254(e)(1). Adams offers no evidence to establish that Morgan provided any information to Smith upon which he could have formed a belief that Adams' case was "less than it might have been." Instead, Adams relies heavily upon a Third Circuit case, *United States v. Miller,* 624 F.2d 1198 (3rd Cir. 1980), to argue a presumption of impropriety. However, *Miller* is factually distinguishable from the instant case. In *Miller,* the Court disqualified a former Assistant United States Attorney ("AUSA") from representing a defendant in a tax fraud case, because the

AUSA had supervised the government's preparation of the case against the defendant. The Court's concern centered on the public's inevitable perception that the AUSA would use confidential information obtained during his position as a federal employee to benefit his new private client. *Miller*, 624 F.2d at 1202. Noting that the law firm employing the former AUSA advertised him to current and potential tax clients as "Chief of the Criminal Tax Fraud Unit within the United States Attorney's Office," the Court added, "[p]ublic confidence in the government's prosecutors is essential, but it may be lost if former prosecutors assume private employment that appears to involve conflicts of interest." *Id.* at 1202-03. The Court extended the order of disqualification to include the AUSA's law firm because it failed to demonstrate the existence of an internal screening mechanism that would have prevented the exchange of information between the AUSA and other attorneys working on the defendant's case. *Id.* at 1204.

In the present action, Adams offers no factual foundation to support the conclusion that Smith had a conflict of interest. Unlike the attorney in *Miller*, Morgan neither represented Adams nor participated in Smith's representation of Adams. Further, in *Miller,* the government sought disqualification of the AUSA based upon the logical and practical concern that the AUSA's loyalty would shift from the government to his new client. Here, Adams proposes the opposite: that information gained by Morgan as an Assistant Prosecuting Attorney was in some unspecified manner used to harm Adams, a client of his new "law firm." Adams' contention is based entirely on speculation and, frankly, defies common sense. While Adams may be able to demonstrate a "theoretical division of loyalties" on the part of Morgan, he is unable to show any link to Smith.

Assuming *arguendo* that Adams could establish a link to Smith, he fails to prove by a preponderance of the evidence that the conflict of interest actually affected the quality of Smith's representation. The state habeas court found that "Petitioner was never prejudiced by Morgan's subsequent employment with the Public Defender's office ... Likewise, had any error occurred there is absolutely no reasonable possibility that any prejudice flowing from that error could have made a difference in the jury's verdict." (Docket 8-3 a 52). Adams offers no plausible alternative defense strategy or tactic that might have been pursued by Smith, which was objectively reasonable and clearly suggested by the circumstances. Instead, Adams merely criticizes the skill with which Smith presented the defense advanced by Adams. In the absence of evidence that **Smith** had an actual conflict, the undersigned **FINDS** the state court's rejection of Adams' conflict of interest claim was not objectively unreasonable.

### 2.    *Adequacy of Investigation*

Adams next argues that Smith failed to fully and properly investigate the case prior to trial. According to Adams, Smith should have: interviewed patrons and employees of The Raging Bull about the interactions between Adams and the victim on the night in issue; ordered forensic testing on the items recovered from the cemetery and in the interior of Adams' automobile by the State Police; interviewed witnesses at Stogie's and Burger King; and interviewed the victim's neighbors, who could have established an ongoing relationship between Adams and the victim. (Docket No. 34 at 16-24). In response, Respondent posits that Adams' assertion of an inadequate investigation is fallacious, because none of the suggested investigation would have changed the outcome of the case. (Docket No. 42 at 22-27). The state habeas court reached a similar conclusion, stating as follows:

> Petitioner's trial counsel reasonably conducted a thorough investigation
> of all issues Petitioner cited, interviewed witnesses, and effectively
> represented Petitioner's interests throughout the trial. Additionally, had
> any unprofessional errors existed, the proceeding's results would have
> remained the same because sufficient evidence existed for a jury to find
> beyond a reasonable doubt that Petitioner Kidnapped and Sexually
> Assaulted [the victim].

(Docket No. 8-3 at 46).

The duty of defense counsel to investigate is well-established and requires counsel to make reasonable investigations or "to make a reasonable decision that makes particular investigations unnecessary." *Strickland,* 466 U.S. at 690-91. The Supreme Court identified in *Strickland* the standards by which to assess counsel's duty to investigate, stressing that "a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Id.* at 691. The Court added:

> The reasonableness of counsel's actions may be determined or
> substantially influenced by the defendant's own statements or actions.
> Counsel's actions are usually based, quite properly on informed
> strategic choices made by the defendant and on information supplied by
> the defendant. In particular, what investigation decisions are
> reasonable depends critically on such information. For example, when
> the facts that support a certain potential line of defense are generally
> known to counsel because of what the defendant has said, the need for
> further investigation may be considerably diminished or eliminated
> altogether. And when a defendant has given counsel reason to believe
> that pursuing certain investigations would be fruitless or even harmful,
> counsel's failure to pursue those investigations may not later be
> challenged as unreasonable.

*Id.* An error by counsel in investigating a case, "even if professionally unreasonable, does not warrant setting aside the judgment of the criminal proceeding if the error had no effect on the judgment." *Id.*

Adams contends that Smith's investigation was inadequate because he failed to interview witnesses at The Raging Bull, Stogie's, and Burger King. However, he fails

to demonstrate how this information would have affected the outcome of the trial. Both Adams and the victim testified that they met at The Raging Bull on the night in question, had drinks, and danced. Both agreed that they left the bar together with the intent to continue socializing at the home of Adams' friend. Neither party provided testimony to suggest that their interactions at The Raging Bull were anything other than friendly and consensual. Accordingly, information from witnesses at The Raging Bull would have had no effect on the outcome of the trial. Adams indicates that this information was "crucial" to rebut the State's theory that Adams kidnapped the victim. Inasmuch as the State never contended that Adams forcibly removed the victim from The Raging Bull, this contention lacks merit.

Similarly, Adams argues that counsel should have interviewed witnesses at Stogie's and Burger King presumably to question them about the victim's appearance after the alleged assault. Both Adams and the victim testified that they went to Stogie's, a drive-thru convenience store, to purchase cigarettes for the victim. Neither Adams nor the victim got out of the vehicle or had any in-depth conversation with the sales clerk. Although the victim denied driving through Burger King, once again the contact between the victim, who was seated on the passenger's side of the vehicle, and any fast food worker at Burger King would have been minimal. The victim did not contend that she attempted to flee from the vehicle at either of these sites, or spoke to the sales clerk, or expressed fear, or acted in any peculiar manner. To the contrary, she testified that she did not try to escape after having made an earlier attempt and remained in the vehicle until Adams dropped her off near her home. In addition, the crimes were not reported until three weeks after they occurred. The chance of obtaining useful information from strangers, who had at most only minimal contact

with the victim three or more weeks earlier, was slight. The undersigned finds that Adams has not presented sufficient evidence to overcome the deferential standard inherent in a *Strickland* review. Considering the defense strategy and the improbability that the suggested interviews would have been fruitful, Smith's decision not to interview potential witnesses at The Raging Bull, Stogie's and Burger King did not constitute ineffective assistance and did not conceivably affect the outcome of the trial. The undersigned **FINDS** that the state court's conclusion on this issue is not unreasonable.

Adams' criticism of counsel's failure to perform forensic testing is similarly unfounded. Adams emphasizes that the State Police found trash in the cemetery, which should have been tested for fingerprints, and hair in Adams' vehicle, which should have undergone DNA testing. According to Adams, by failing to test these items, the defense was unable to challenge the victim's story that she had been assaulted in Adams' vehicle and at the cemetery. (Docket 34 at 19-21). He also argues that by not attacking this evidence, Smith allowed the Prosecutor to introduce evidence that unfairly validated the victim's story. This assertion fails because Adams readily admitted that he took the victim to Kentucky and engaged in sexual acts; that he drove the victim to the cemetery where they cleaned trash out of the car and engaged in sexual acts; and that they engaged in sexual acts inside his vehicle. The intent of the defense was not to refute the locations or the events described by the victim, *per se,* but to explain that all of the contacts between Adams and the victim were consensual. (Docket No. 41-6 at 33-34).  As a result, Smith's strategy was to be open about the events of the night so that the jury would appreciate that Adams was being honest, telling the positive and admitting the negative; thereby, giving his story

more credibility than the victim's. (*Id.; See also* Docket 8-3 at 45). To that end, Adams' testimony at trial regarding the sites of his sexual activity with the victim corresponded with her testimony. In view of the defense strategy, forensic testing of the trash at the cemetery and hair in the car would not have yielded particularly useful information. Moreover, Smith established at trial that the State had not tested the evidence either; thus, the hair found in the trunk of Adams' car could have belonged to anyone, including Adams' daughter, who had blonde hair like the victim. When considering the hair found in the trunk of Adams' car, Smith likely took into account the potential that the victim planted her own hair in the trunk when she inspected Adams' car immediately prior to lodging her criminal complaint.  As a result, performing DNA tests on the hair may only have resulted in evidence that corroborated the victim's story while severely damaging Adams' defense. Defense counsel is not ineffective for failing to pursue testing that would have been fruitless at best and harmful at worst. *Strickland,* 466 U.S. at 691.

Finally, Adams contends that defense counsel performed an inadequate investigation by failing to canvass the victim's neighbors; particularly, in light of the post-conviction statements of two neighbors that suggested that Adams had a prior, ongoing romantic relationship with the victim. (Docket 34 at 22-24). The state habeas court aptly rejected this contention, noting that the statements of the neighbors were immaterial and unlikely to change the outcome of the trial, because they directly contradicted Adams' testimony that he did not know the victim before he met her on the night in question. (Docket No. 8-3 at 49-50). At trial, Adams testified that he asked the victim to leave The Raging Bull with him, but did not expect her to come because "it just ain't an original thing a woman will do to meet you right off the bat

and leave the bar with you after one drink and one song." (Docket No. 41-3 at 25). This testimony was confirmed by the victim, who also testified that she had never met Adams before drinking with him at The Raging Bull on the night of the alleged crimes. When questioned about his investigation, defense counsel indicated that he would have interviewed the victim's neighbors if Adams had reported a prior relationship with the victim. However, defense counsel was not given such information by any source; therefore, he saw no reason to interview the victim's neighbors. (Docket No. 41-6 at 62-63). The Supreme Court acknowledged in *Strickland* that the reasonableness of counsel's investigation must be viewed in light of the information provided by the defendant. Adams never suggested a prior relationship with the victim; accordingly, defense counsel had no reason to pursue that avenue. Moreover, the testimony was contrary to Adams' story. Therefore, the undersigned **FINDS** that the state habeas court's rejection of Adams' "failure to investigate" claims was not an objectively unreasonable application of *Strickland*.

### 3. *Failure to Call Key Rebuttal Witnesses*

Adams contends that defense counsel should have called his private investigator to challenge testimony by Angela Walker, a prosecution witness. (Docket Nos. 34 at 24-25 and 34-1 at 1). Ms. Walker was asked at trial if the victim offered to give her money at some point after the alleged crimes, implying payment for testimony. The witness testified that the victim offered "to help" her, but never expressly offered to give her money. The witness further stated that she subsequently asked the victim for money, and the victim refused her request. (Docket No. 41-2 at 119). Defense counsel's private investigator testified at the habeas proceeding that Ms. Walker had told him that the victim offered to pay her "to come" to trial. He did

not suggest that the victim actually paid the witness to testify, or that the witness' testimony at trial was affected in any way by the alleged offer of payment. The state habeas court found that Ms. Walker "emphatically denied at trial the defense's allegation that the victim offered her money in exchange for testimony." (Docket 8-3 at 46).   The court also questioned the propriety of calling a rebuttal witness to impeach the credibility of a secondary witness.

A review of the trial transcript reveals that Ms. Walker's testimony provided some benefit to Adams and was not entirely supportive of the prosecution, which significantly reduced the likelihood that she was paid for providing specific testimony. (Docket no. 41-2 at 113-122). In addition, her testimony was not especially pertinent to the key issue in the case; that being, whether the victim consented. Ms. Walker could only testify that the victim voluntarily left the residence with Adams; thereafter, Ms. Walker was not present and could not comment on any of the crucial events. The state habeas court found, and the undersigned agrees, that Adams is unable to demonstrate a reasonable probability that the outcome of the proceeding would have been different if defense counsel called the private investigator to rebut the testimony of Ms. Walker on the circumstances surrounding the offer made by the victim. Therefore, the undersigned **FINDS** that the state court's rejection of Adams' claim for relief on this ground did not constitute an objectively unreasonable application of *Strickland*.

### 4.   *Failure to Meet with and Prepare Petitioner*

Adams asserts that defense counsel failed to adequately meet with and prepare him prior to trial.  (Docket No. 34-1 at 1-4). The Fourth Circuit has unequivocally held that "there is no established 'minimum number of meetings between counsel and

client prior to trial necessary to prepare an attorney to provide effective assistance of counsel.'" *Moody v. Polk,* 408 F. 3d 141, 148 (4th Cir. 2005), quoting *United States v. Olson,* 846 F.2d 1103, 1108 (7th Cir. 1988). The sufficiency of counsel's preparation must be weighed on a multifactorial scale, taking into account such things as the experience of defense counsel; the complexity of the case; the efficient allocation of time; the number of productive investigative leads; the amount and inconsistency of evidence; and the number of witnesses and their anticipated testimony. Adams must show that the purported lack of preparation constituted deficient assistance, as well as a reasonable probability that, but for the lack of preparation, the result of the trial would have been different. *Moody,* 408 F.3d at 146.

Adams asserts that more consultation would have led to "additional witnesses" and "a clearer picture of the charges," but fails to identify any critical witnesses who were absent at trial, or articulate any specific misunderstanding of the charges. Adams likewise fails to offer evidence or argument to rebut the presumption that counsel's conduct fell within the wide range of reasonable professional assistance. The record reflects that the number of relevant witnesses was limited by the nature and scope of the dispute between Adams and the victim. They largely agreed on the sequence of events that occurred prior to their departure from the Walker residence. With some minor differences, they generally agreed on the locations they visited after they left the residence and that they repeatedly engaged in sexual intercourse. Defense counsel testified at the state habeas hearing that he met and spoke with Adams on multiple occasions and crafted his trial strategy based upon Adams' unequivocal position that the victim willingly accompanied him, consented to sexual intercourse, and was now, weeks later, accusing him of rape in retaliation for his

refusal to leave his wife. The heart of the case was simple, the forensic evidence was minimal, and the key witnesses were limited in number and knowledge. In view of the relative simplicity of the defense, no evidence exists to substantiate a finding that defense counsel failed to adequately prepare Adams.

Adams also points to the circumstances surrounding his decision to testify at trial as further proof that he was not adequately prepared by his counsel. (*Id.*). Specifically, Adams argues that he was not fully advised of his right to remain silent. However, the trial transcript confirms that counsel discussed this issue with Adams before he decided to testify and had an additional conversation with Adams immediately prior to him taking the witness stand. (Docket No. 41–3 at 9-12). While Adams' decision to testify may have indeed affected the outcome of the trial, the undersigned does not need to consider the extent of that likelihood, because Adams does not meet the first prong of the *Strickland* test. Defense counsel indisputably advised Adams of his right to remain silent, but ultimately the decision to testify remained with Adams. In light of the "he said, she said" nature of the case, taking the witness stand and sharing his side of the story arguably was the best trial strategy. Obviously Adams understood the importance of explaining the events of the night; particularly, as he and the victim were the only witnesses to the transactions that formed the core of the charges against him. In fact, Adams confirmed this understanding during a hearing on the state habeas petition when he admitted that despite receiving instruction on his right to remain silent from both the trial court and defense counsel, Adams wanted to testify. He acknowledged the following in response to questions by Respondent's attorney:

> Q:    And was it not your statement at that time that you intended to testify?
>
> A:    Right.
>
> Q:    You wanted to testify?
>
> A:    Yes.
>
> Q:    So, no matter what your lawyer would have told you up to that point, you would have taken the stand anyway?
>
> A:    Yeah, I would have probably ended up taking that stand anyway.

(Docket No. 41-5 at 154). In view of the forgoing and lack of evidence that additional preparation would have changed the outcome of the trial, the undersigned **FINDS** that the state court's rejection of this claim was not an objectively unreasonable application of *Strickland.*

### 5.    *Alleged Errors at Trial*

Adams raises two challenges related to the introduction and examination of his wife, Barbara Adams, as a witness at trial. (Docket No. 34-1 at 5-12). According to Adams, the decision to offer Mrs. Adams as a witness coupled with Smith's inept direct examination accomplished nothing more than to elicit "highly inflammatory and prejudicial" testimony that "painted a more terrifying picture of Petitioner than had the prosecution." (Docket 34-1 at 4-8). The testimony in question was the following:

> Q:    When you confronted David about where he was the night of— August 23rd I think is the night that he was supposed to be out with her, and out all night and half the day. You talked to him about  where he was?
>
> A:    Yeah, I asked him where he was.
>
> Q:    What did he say?

> A:   He said first that he was out. He had to rob some guy because he ran out of money and needed some money. Then he turned around and said he killed two people and left their bodies in ditches.
>
> Q:   That is kind of strange. Did he mean that?
>
> A:   I wasn't sure. You can't tell about him sometimes.
>
> Q:   What did he say? That is crazy stuff. You are saying that he just talked crazy stuff like that?
>
> A:   Yeah. Anytime you catch him up in something and he doesn't want you to know what it is he has been doing, he says outrageous things just to keep from telling you what happened.
>
> Q:   So when he said he was out robbing people and killing people, you didn't believe that?
>
> A:   No.
>
> Q:   That's just the way, David's way?
>
> A:   Yeah.

(Docket No. 41-3 at 18-19). On cross-examination, Adams' wife clarified this testimony, stating:

> Q:   You can't believe him, can you?
>
> A:   You can believe him part of the time but there are some things that he comes off with that are just really off the wall.
>
> Q:   Part of the time you can believe him?
>
> A:   I usually believe pretty much what he says until it comes to something really outrageous like what he had told me.
>
> Q:   So, you think he's a believable person?
>
> A:   For the most part, yeah, he is.

(*Id.* at 22).

While at first blush, these excerpts appear unusual, even damaging to Adams, upon reading Mrs. Adams' testimony as a whole, it becomes clear that these statements were not intended to be taken literally. Moreover, Ms. Adams was a necessary witness to support the defense strategy and create reasonable doubt of Adams' guilt. Smith testified at the habeas hearing that according to his client, he met the victim at a bar and "[w]e got together. We went out. We partied. We had sex. Now she says I raped her." Accordingly, defense counsel had to address in some fashion for the jury the fact that Adams, a married man, was unfaithful to his wife; that the physical damage to Adams' car purportedly inflicted by the victim while trying to escape actually pre-existed the night of the alleged crimes; and that the victim claimed kidnapping and rape three weeks later in retaliation for Adams' subsequent refusal to leave his wife. Considering these goals, Smith's decision to call Adams' wife as a witness was justifiable, even strategically sound. Mrs. Adams provided important testimony on the issue of adultery by indicating that her husband had not previously been unfaithful and she had forgiven him for his indiscretion with the victim. She confirmed that the damage to the vehicle described by the victim was present before the night of the alleged crimes. In addition, Ms. Adams verified that the victim showed up at the Adams' home several weeks after commission of the alleged crimes to inspect his car, which is behavior inconsistent with the victim's claims that she feared Adams would kill her. Only after examining the car and speaking with Mrs. Adams did the victim make her first report of the crimes to the police. Mrs. Adams' testimony obviously was offered to introduce doubt as to the victim's veracity and motives; to suggest that the victim tailored her testimony to the damage she observed in the car; and to corroborate portions of Adams' story.

Unfortunately for trial lawyers, the introduction of any witness is fraught with peril, because the lawyer has limited control over what the witness will say while on the witness stand. A strong presumption exists that the performance of counsel during trial fell within the wide range of reasonable professional assistance, and the court should not scrutinize counsel's tactical decisions in the manner of a "Monday morning quarterback." *See, e.g.*, *United States v. Terry*, 366 F.3d. 312, 317 (4th Cir. 2004). When evaluating a decision to call a particular witness to the stand, "[t]he difficulty of overcoming that general presumption is even greater ... given that 'the decision whether to call a defense witness is a strategic decision' demanding the assessment and balancing of perceived benefits against perceived risks, and one to which '[w]e must afford ... enormous deference.'" *Terry*, 366 F.3d at 317 (citing *United States v. Kozniski*, 16 F.3d795, 813 (7th Cir. 1994)) (internal quotation marks omitted). For that reason, decisions regarding the examination of witnesses generally do not form the basis of a successful *Strickland* challenge. Consequently, Smith's decision to call Ms. Adams as a witness and the alleged inartfulness of his examination do not meet the first prong of the *Strickland* test.

Adams also complains that Smith acted ineffectively when he failed to object to evidence offered by a prosecution witnesses that Adams was "drunk driving" on the night of the alleged crimes. However, Smith explained that the strategy of the defense was to be "open and forthright in trying to help the jury find the truth." (Docket 41-6 at 56-57). He testified at the habeas hearing as follows:

Q:   To follow that up, during any trial, are there matters that generally come up that could be objected to that as part of trial strategy lawyers would not object to?

A:   Yes, that would be true.

> Q:    Is that based upon the belief that we discussed in the question before that with regard to not making endless objections or not interrupting for just any reason whatsoever?
>
> A:    I would agree that those are considerations and add too—especially in this kind of case where we're dealing with basically he said she said kind of situation. I would have approached it with an idea of not trying to look like to the jury and in fact not trying to bar them from hearing things or make it look like we were trying to hide things.

(*Id.*). In any event, Adams confirmed at trial that he was drinking and smoking marijuana on the night in question; thus, the witness' conclusory testimony that Adams was driving drunk was not particularly explosive or prejudicial. The state habeas court found trial counsel's strategic decisions at trial to fall within the wide range of acceptable professional performance. The undersigned does not find the state court's conclusion to be objectively unreasonable; therefore, Adams is not entitled to relief on this claim.

Adams also argues that the incidents which occurred in Kentucky should have been the subject of a motion to suppress under West Virginia Rule of Evidence 404(b).  (Docket No. 34-1 at 7-8). The state habeas court explicitly addressed this challenge, finding as follows:

> Petitioner's trial counsel effectively represented Petitioner's interest despite not filing Motions for forensic examination of evidence in the file, fingerprint analysis, and to suppress evidence of the Petitioner's and Victim's sexual relations in Kentucky. To suppress the evidence of sexual relations in Kentucky on West Virginia Rule of Evidence 404(b) grounds would be contrary to trial strategy because trial counsel's strategy, based on Petitioner's explanation of events, was that the sexual acts between Petitioner and Victim were consensual.

(Docket No. 8-3 at 47). Indeed, some of the testimony elicited by Smith at trial regarding the trip to Kentucky buttressed his defense. For example, on cross-

examination, the victim testified that after she was allegedly sodomized by Adams along the interstate in Kentucky, he let her go and left the scene. Although she had an opportunity to flee, waive down another vehicle, or hide, she made no effort to do so. When he returned some time later and told her to get back into the car, she complied. The victim admitted that she voluntarily returned to the vehicle and made no effort to escape despite having reportedly been brutalized by Adams and being in fear for her life. Certainly, this testimony lent credence to Adams' story that the victim traveled with him to Kentucky of her own free will and voluntarily spent the rest of the morning with him.

In order to succeed on a *Strickland* claim related to the failure of counsel to file suppression motions, a petitioner must demonstrate that the motions would have been successful. *Kimmelman v. Morrison,* 477 U.S. 365, 375, 106 S.Ct. 2574, 91 L.Ed.2d 305 (1986) (Where defense counsel's failure to litigate a Fourth Amendment claim competently is the principal allegation of ineffectiveness, the defendant must also prove that his Fourth Amendment claim is meritorious and that there is reasonable probability that the verdict would have been different absent the excludable evidence in order to demonstrate actual prejudice). Here, the proposed motions for suppression likely would have failed, because the trip to Kentucky and the events in the vehicle and at the cemetery were offered by the prosecution as *res gestae* and were "inextricably intertwined" with the crimes alleged by the victim. *See State v. Grimes,* 701 S.E.2d 449, 458 (W.Va. 2009). ("Rule 404(b) did not apply where the 'other bad acts' of the defendant ... constituted intrinsic evidence and were admitted to complete the story culminating in the victim's death," *citing State v. Hutchinson,* 599 S.E.2d 736, 744 (W.Va. 2004)). *See, e.g., State v. Hager,* 511 S.E.2d

139, 148 (W.Va. 1998) ("Where a course of criminal conduct is continuous and interwoven, consisting of a series of related crimes, the perpetrator has no right to have the evidence 'sanitized' so as to deny the jury knowledge of all but the immediate crime for which he is on trial. The fact-finder is entitled to all of the relevant and connected facts, including those which followed the commission of the crime on trial, as well as those which preceded it; even though they may show the defendant guilty of other offenses"). More importantly, suppression motions would have been contrary to and counterproductive of the defense's strategy. Adams could not have adequately told his story if he excised large gaps of time from the chronology. The defense strategy to be completely open about the events of the night would have been severely hindered by carving out integral portions of their interactions. A federal habeas petition is not the appropriate forum in which to "take back" a defense strategy that ultimately proved unsuccessful. Accordingly, the undersigned **FINDS** the state court's finding that Adams failed to establish ineffective assistance of counsel or prejudice on this ground is not an objectively unreasonable application of *Strickland*.

Finally, Adams contends that Smith's failure to move for a dismissal in light of the "inherently incredible" testimony of the victim amounted to ineffective assistance of counsel.[4] (Docket No. 34-1 at 12-14). The WV Supreme Court delineated the standard upon which a trial court could grant a motion for acquittal based upon inherently incredible testimony, holding "when a trial court is asked to grant a motion for acquittal based on insufficient evidence due to inherently incredible testimony, it should do so only when the testimony defies physical laws." *State v.*

---

[4] In fact, the trial transcript substantiates that Smith did move for acquittal at the close of the State's case. (Docket No. Exh. 16 at 152)

*McPherson,* 371 S.E.2d 333, 338 (W.Va 1988). The state habeas court reviewed the trial transcript and determined that "sufficient evidence existed for a jury to find beyond a reasonable doubt that Petitioner Kidnapped and Sexually Assaulted [the victim]." (Docket No. 8-3 at 46). As such, the court implicitly found the victim's testimony to be credible, or at least, not inherently incredible. Credibility findings made by the state court are factual determinations, which are presumed correct unless rebutted by clear and convincing evidence. 28 U.S.C. § 2254(e)(1). To bolster his conclusory statement that the victim was "inherently incredible," Adams points to a few inconsistencies in the victim's testimony, which were recognized and adequately addressed by Smith at trial.   Other than that, Adams offers nothing. Accordingly, Adams has not rebutted by clear and convincing evidence the state court's finding that the victim was sufficiently credible to present the case to the jury. Inasmuch as the victim was not inherently incredible, a motion for acquittal on that ground would have been frivolous. The law is well-settled that the failure of defense counsel to make a frivolous motion cannot support a claim of ineffective assistance of counsel.  *See Moody v. Polk,* 408 F.3d 141, 151 (2005). Consequently, the state court's rejection of this challenge was not objectively unreasonable.   Therefore, the undersigned **FINDS** that Adams has not established a basis for relief arising from the alleged errors of counsel at trial.

### 6.   *Representation at Sentencing*

Adams contends that Smith provided ineffective assistance of counsel at sentencing, arguing that "the only effective thing Mr. Smith did at the sentencing was to ensure that he was in fact still named as the Petitioner's attorney."  (Docket No. 34-1 at 15). After confirming his continued appointment as counsel, Smith "proceeded to

do absolutely nothing." (*Id.*). However, Adams offers no insight into what he believes Smith should have done differently or how Smith's performance negatively affected the outcome.[5] (Docket No. 34-1 at 14-16). Instead, he urges the court to find that the circumstances surrounding the sentencing make it "unlikely that [Petitioner] could have received the effective assistance of counsel" and, therefore, justify a presumption of prejudice. *United States v. Cronic,* 466 U.S. 648, 666, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984). The transcripts of the post-conviction trial phase and the sentencing hearing do not demonstrate circumstances so egregious as to merit a finding of ineffective assistance of counsel or a resulting presumption of prejudice.[6] *See Kitchen v. United States,* 227 F.3d 1014, 1020 (7th Cir. 2000)("Prejudice, however, can be presumed only in the most egregious cases of ineffective assistance— those where '[p]rejudice ... is so likely that case-by-case inquiry into prejudice is not worth the cost,' and '[a]ctual or constructive denial of the assistance of counsel altogether is legally presumed to result in prejudice.'" (internal citations omitted)).

As Respondent points out, and the record substantiates, Smith was present at the sentencing and participated in the proceeding. (Docket No. 42 at 38-39). Adams

---

[5] The undersigned notes that the state habeas court entered an Order on January 7, 2010 (Docket No. 41-1 at 63-64) finding, *inter alia*, that Petitioner had not previously raised the claim of ineffective assistance of counsel at sentencing in his first Petition for a Writ of Habeas Corpus. Consequently, the court recognized West Virginia's statutory rebuttable presumption that Petitioner knowingly and intelligently waived that contention. Despite this finding, the court examined the merits of the claim and rejected it, concluding that trial counsel's representation of Petitioner was sufficient under the *Strickland* standards.

[6] For example, constitutional error without need to show prejudice has been found in the following circumstances: (1) counsel was absent or prevented from assisting the defendant during a critical stage of the proceedings, *See Cronic,* 466 U.S. at 659, n. 25; (2) counsel admitted defendant's competency to stand trial despite strong evidence to the contrary, *Hull v. Kyler,* 190 F.3d 88 (3rd Cir. 1999); (3) counsel refused to participate at trial, *Martin v. Rose,* 744 F.2d 1245 (6th Cir. 1984); and (4) counsel appeared at sentencing, but was unfamiliar with the case and the defendant, *Tucker v. Day,* 969 F.2d 155 (5th Cir. 1992).

confirmed the accuracy of the pre-sentencing report and was permitted to make a statement in mitigation of the sentence. The trial court ultimately based Adams' sentence on the governing statutes, taking into account the testimony at trial; Adams' perceived lack of respect for others; and his persistent refusal to accept responsibility for the crimes. (Docket No. 42-4 at 78-80). Smith was incapable of changing any of those items. Moreover, the sentence for Adams' kidnapping conviction had already been determined by the jury. The trial court was mandated by statute to sentence Adams to life in prison. The only outstanding question—that being, Adams' eligibility for parole—was decided by a unanimous jury verdict in a post-conviction phase of the trial. During this phase, Smith cross-examined the prosecution's witness and offered Adams' mother to testify in support of mercy; Smith's efforts were no doubt effective in view of the jury's recommendation.  (Docket No. 41-4 at 55-56).

The circumstances surrounding the sentencing do not reflect a process that had lost "its character as a confrontation between adversaries." *Cronic*, 466 U.S. at 657. "The appropriate inquiry focuses on the adversarial process, not on the accused's relationship with his lawyer as such." *Id.* Accordingly, although Adams claims that Smith "did absolutely nothing" before and during the sentencing, Adams has not demonstrated grounds sufficient to support a *prima facie* finding of ineffectiveness. Hence, Adams must show how specific errors by counsel undermined the reliability of the outcome. *Id.* The state habeas court did not find any such errors, and Adams offers nothing concrete to challenge that conclusion. Consequently, the undersigned finds that the state court's application of *Strickland* on this issue was not objectively unreasonable.

### 7.   *Failure to Move for Suppression of Evidence*

Adams asserts that Smith was ineffective for failing to file motions to suppress evidence obtained from his vehicle and from the cemetery. (Docket No. 34-1 at 16-18).  Adams alleges that the evidence found in the vehicle should have been excluded, because it was obtained when law enforcement officers conducted a warrantless search and seizure. He further contends that items found at the cemetery, including items that allegedly fell from the victim's purse when Adams searched it for money, should have been excluded because they were "common items obtained from a cemetery to which many people and many different cars had access." (*Id.* at 17).

The trial transcript reflects that the search conducted on Adams' vehicle did not occur until after the officers obtained a search warrant. According to the testimony of the investigating officer, he located the vehicle described by the victim "and impounded it ***after which time I went and got a search warrant from the magistrate for that vehicle and inspected the car***." (Docket No. 41-2 at 135). Therefore, that challenge is factually unsupported by the record.

The transcript also confirms that the officers did not request forensic testing on the items found in the vehicle, such as fingerprints and hair, because both the victim and Adams agreed that they were in the automobile together and engaged in sexual intercourse. (*Id.* at 145-46). Moreover, the jury was aware from the testimony of both the victim and Adams that trash was removed from Adams' vehicle and left at the cemetery.  Since neither party contested that they were at the cemetery, testing items of trash found there would not have yielded useful information. Adams complains that testimony from the investigating officer confirming that he found items at the cemetery that matched those described by the victim as coming from her

purse served to unfairly validate the victim's version of the events; however,  in view of Adams' testimony, that contention carries little weight. The jurors were well aware that three weeks had elapsed between the night of the alleged crimes and the date on which the victim filed her criminal complaint. They were also aware that the victim retraced the route and "inspected" Adams' car before reporting the crimes. Certainly, the jurors could infer that items found in the cemetery belonged to someone else or were planted by the victim before making the complaint. Nevertheless, tying the trash and other items to Adams and the victim was inconsequential when considering their corresponding testimony that they had been there together.   Accordingly, it is improbable that filing motions to suppress this evidence would have changed the outcome of the trial.  As such, the undersigned **FINDS** that state court's rejection of this *Strickland* claim was not objectively unreasonable.

### 8.      *Failure to Offer Abduction Instruction*

Adams argues that Smith was constitutionally ineffective for failing to offer an instruction on the crime of abduction, a lesser-included offense of kidnapping. According to Adams, the evidence offered at trial more closely correlated with an abduction charge, which carried a substantially lighter sentence. (Docket No. 34-1 at 18-20). Respondent counters this argument by emphasizing that abduction is not a lesser-included offense of kidnapping; Adams was charged with kidnapping, not abduction; therefore, Smith was not ineffective for failing to offer an inappropriate instruction.  (Docket No. 42 at 45-48). The state habeas court addressed this issue as a direct challenge rather than as an ineffective assistance of counsel claim and found that Adams had procedurally waived the issue because he raised it for the first time on appeal, rather than during trial. (Docket No. 8-3 at 54).

The undersigned need not address the procedural issue, because Adams'
substantive argument is flawed. A review of the West Virginia statutes pertaining to
abduction and kidnapping reflects that the state legislature intended these crimes to
be separate offenses with different elements. [7]  Consequently, Adams was not entitled

---

[7] The statutes state, in relevant part, the following:

**§ 61-2-14. Abduction of person; kidnapping or concealing child; penalties**

(a) Any person who takes away another person, or detains another person against such person's will,
with intent to marry or defile the person, or to cause the person to be married or defiled by another
person; or takes away a child under the age of sixteen years from any person having lawful charge of
such child, for the purpose of prostitution or concubinage, shall be guilty of a felony, and, upon
conviction thereof, shall be confined in the penitentiary not less than three nor more than ten years.

**§ 61-2-14a. Penalty for enticing away, kidnapping or holding hostage any person**

(a) Any person who, by force, threat, duress, fraud or enticement take, confine, conceal, or decoy,
inveigle or entice away, or transport into or out of this state or within this state, or otherwise kidnap
any other person, or hold hostage any other person for the purpose or with the intent of taking,
receiving, demanding or extorting from such person, or from any other person or persons, any ransom,
money or other thing, or any concession or advantage of any sort, or for the purpose or with the intent
of shielding or protecting himself, herself or others from bodily harm or of evading capture or arrest
after he or she or they have committed a crime shall be guilty of a felony and, upon conviction, shall be
punished by confinement by the division of corrections for life, and, notwithstanding the provisions of
article twelve, chapter sixty-two of this code, shall not be eligible for parole: Provided, That the
following exceptions shall apply: (1) A jury may, in their discretion, recommend mercy, and if such
recommendation is added to their verdict, such person shall be eligible for parole in accordance with
the provisions of said article twelve; (2) if such person pleads guilty, the court may, in its discretion,
provide that such person shall be eligible for parole in accordance with the provisions of said article
twelve, and, if the court so provides, such person shall be eligible for parole in accordance with the
provisions of said article twelve in the same manner and with like effect as if such person had been
found guilty by the verdict of a jury and the jury had recommended mercy; (3) in all cases where the
person against whom the offense is committed is returned, or is permitted to return, alive, without
bodily harm having been inflicted upon him, but after ransom, money or other thing, or any
concession or advantage of any sort has been paid or yielded, the punishment shall be confinement by
the division of corrections for a definite term of years not less than twenty nor more than fifty; (4) in
all cases where the person against whom the offense is committed is returned, or is permitted to
return, alive, without bodily harm having been inflicted upon him or her, but without ransom, money
or other thing, or any concession or advantage of any sort having been paid or yielded, the punishment
shall be confinement by the division of corrections for a definite term of years not less than ten nor
more than thirty.

(b) For purposes of this section, the terms "to hold hostage" means to seize or detain and threaten to
kill or injure another in order to compel, a third person or a governmental organization to do or
abstain from doing any legal act as an explicit or implicit condition for the release of the person
detained.

to a lesser-included offense instruction. *See State ex. Rel Games-Neely v. Silver*, 697 S.E.2d 47 (W.Va. 2010).

According to the WV Supreme Court, the test for determining whether an offense is a separate or a lesser-included offense of another crime is "whether a particular offense must be such that it is impossible to commit the greater offense without first having committed the lesser offense. An offense is not a lesser included offense if it requires the inclusion of an element not required in the greater offense." *State v. Wright*, 490 S.E.2d 636, 640 (W.Va. 1997) (citing *State v. Neider,* 295 S.E.2d 902 (W.Va. 1982)). Here, the crime of abduction requires proof that the offender took away a person with the intent "to marry or defile" that person or cause that person to be married or defiled. W.Va. Code § 61-2-14. In contrast, the statutory definition of kidnapping does not require proof of intent to marry or defile. Instead, it requires only that the offender "take, confine, conceal, or decoy, inviegle or entice away, or transport into or out of this state or within this state, or otherwise kidnap any other person, or hold hostage any other person for the purpose of or with the intent of *taking, receiving, demanding or extorting from such person, or from any other person or persons, any ransom money or other thing, or any concession or advantage of any sort.*" W.Va. Code § 61-2-14a. (emphasis added). Consequently, it is possible to commit kidnapping without the intent to marry or defile the victim, but it is not possible to commit abduction without that specific intent. As such, abduction is not a lesser included offense of kidnapping. This conclusion finds further support in *State v. Hanna*, 378 S.E.2d 640 (W.Va. 1989). In *Hanna*, the defendant was found guilty of burglary, kidnapping, and abduction with intent to defile. On appeal, the WV Supreme Court concluded that the State had proven the kidnapping charge, but had

not proven the separate offense of abduction because no evidence existed that the defendant removed the victim with the intent to defile. *Id.* at 647.[8]

Finally, it should be noted that Adams' acknowledged the separate nature of these crimes in his initial appeal to the WV Supreme Court when he argued, by counsel, the following:

> [i]t is clear that the crimes of abduction with the intent to defile and the crime of kidnapping are two separate and distinct offenses. With regard to abduction with intent to defile, a sexual purpose or motivation is commonly understood to be an essential element. The kidnapping statute in § 61-2-12a is broader and includes ransom or shielding from bodily harm or evading capture after commission of a crime. (citations omitted).

(Docket No. 8-1 at 26).   In view of this admission, Adams is hard-pressed to argue that Smith was ineffective for failing to offer an instruction on abduction. Therefore, the undersigned **FINDS** that the state habeas court did not unreasonably apply *Strickland* when rejecting this claim.

---

[8] *See also State ex. Rel Games-Neely v. Silver,* 697 S.E.2d 47 (W.Va. 2010), which addresses the issue of the legislative intent behind the creation of similar offense statutes. In *Silver,* the West Virginia Supreme Court examined the question of whether the legislature intended the offense of first degree arson to be separate from the offense of arson resulting in serious bodily injury. The defendant, having been convicted of both offenses, argued that first degree offense of arson resulting in serious bodily injury; therefore, imposing a sentence for both offenses would violate the double jeopardy clauses of the State and Federal Constitutions. In response, the State argued that the offense of arson resulting in serious bodily injury was intended by the legislature to be an enhancement statute. The Supreme Court began its analysis by recognizing that, by definition, a lesser included offense "must be a less serious crime in terms of its classification and degree." *State ex. rel Games-Neely,* 697 S.E.2d at 52 (citing *State v. Penwell,* 483 S.E.2d 240, 245 (W.Va. 1996)). Applying this rule, the Court rejected defendant's argument that first degree arson was a lesser included offense of arson resulting in bodily injury, because its penalty was longer. The Court then considered whether the legislature intended for the two offenses to be separate and, thus, to expose an offender to "two distinct punishments for the same underlying conduct." *Id.* The Court observed that to establish "arson resulting in serious bodily injury, the state must first prove the elements of first degree arson, but all the elements of arson resulting in serious bodily injury are not required to prove first degree arson." *Id.* at 53. This statutory distinction convinced the Court that the legislature intended the offenses to be separate for purposes of punishment. While this discussion does not precisely address the issue in the instant case, it reiterates that legislative intent can be inferred by examining whether each offense requires an element of proof the other does not.

### 9.    *Failure to Move for Mental Health Evaluation*

Adams' final claim of ineffective assistance of counsel centers on Smith's failure to seek an evaluation of Adams' competency.[9] In support of this contention, Adams argues that he has a history of "mental health issues" that were recognized in "his formative years." (Docket No. 34-1 at 20-12). However, Adams offers no evidence that he was suffering from mental health issues at the time of the crimes or his trial. Likewise, he offers no evidence or argument that his behavior was sufficiently odd or erratic to have triggered a bonafide question as to his competency. Obviously, to successfully raise this challenge, Adams must demonstrate a reasonable probability that he was mentally incompetent at the time of the crimes or at trial. See *Hull v. Kyler*, 190 F.3d 88, 105 (3rd Cir. 1999) (citing *Felde v. Butler*, 817 F.2d 281, 282 (5th Cir. 1987)) (a petitioner satisfies *Strickland's* prejudice prong "only if he demonstrates that there is a reasonable probability that but for [his counsel's] failure to seek a competency hearing, he would have been found incompetent to stand trial"). Adams wholly fails to meet this burden. Accordingly, he has not established the factual threshold necessary to assert a valid *Strickland* claim.

Further, the state habeas court rejected Adams' competency claim, noting that "Petitioner never raised this issue in his first petition for Writ of Habeas Corpus filed on the 24th day of October, 2002; any of the three hearings conducted on this matter; or in the habeas corpus petition consolidated with 00-C-227. (*Adams v. McBride*, 00-

---

[9] Petitioner argues in conclusion that the "cumulative effect" of Smith's errors deprived him of a fair trial. The Fourth Circuit has addressed the effect of multiple errors on a petitioner's right to relief under § 2254, concluding that errors which are not unconstitutional when viewed individually cannot be "added together to create a constitutional error."  *Fisher v. Angelone,* 163 F.3d 835, 853 (4th Cir. 1998), citing *Wainwright v. Lockhart,* 80 F.3d 1226, 1233 (8th Cir.).

C-227). Finding that Adams' petition was silent on the issue of waiver, the court found that Adams failed to rebut the presumption of waiver set forth in West Virginia Code § 53-4A-1(c). A state court's determination of procedural default is entitled to deference by a federal habeas court. *Sharpe v. Bell*, 593 F.3d 372 (4th Cir. 2010) (citing *Barnes v. Thompson*, 58 F.3d 971, 974 n.2 (4th Cir. 1995); *see also Wainwright v. Sykes*, 433 U.S. 72, 87-91, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977); *Burket v. Angelone*, 208 F.3d 172, 183 (4th Cir. 2000). Having reviewed the record, the undersigned **FINDS** no factual basis to support a *Strickland* claim and further defers to the state court's determination of procedural default.

### B.   Prejudicial Evidence

Adams alleges as a separate basis for federal habeas relief that prejudicial evidence introduced at his trial violated his "federal constitutional rights as articulated by the United States Supreme Court."[10] (Docket No. 34-1 at 23). Adams does not expand on this conclusory statement. As Respondent suitably notes, the prejudicial evidence described by Adams was either admitted at trial without objection or was offered by defense counsel in furtherance of Adams' trial strategy. (Docket No. 42 at 52). Accordingly, Adams waived his right to present this alleged error on appeal or on petition for habeas relief. In any event, a misapplication of state law does not establish a ground for habeas relief. *Estelle v. McGuire*, 502 U.S. 62, 68, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991). The federal court does not "review the admissibility of evidence under state law unless erroneous evidentiary rulings were so

---

[10] Adams raises this same issue as a claim of ineffective assistance of counsel.  *See Analysis Section, Paragraph A, subparagraphs 2, 5, and 7, supra.*  For the reasons previously set forth herein, motions for suppression would likely have failed.

extreme as result in a denial of a constitutionally fair proceeding." *Barbe v. McBride,* 521 F.3d 443 (4th Cir. 2008).   Having thoroughly reviewed the record, the undersigned **FINDS** that no valid basis exists to conclude that Adams was denied a fair trial.  Accordingly, the undersigned defers to the evidentiary rulings of the state court and rejects this claim for habeas relief.

### C.   Newly Discovered Evidence

Adams alleges that Mr. James Combs, a neighbor of the victim, can offer newly discovered evidence that proves the existence of an ongoing relationship between Adams and the victim; thereby, impeaching the victim's credibility on the issue of consent. The state habeas court rejected this evidence on the basis that it was "immaterial, would not likely create an opposite result at a subsequent trial on the merits, and contradict[ed] Adams' own trial testimony that the incident date was the first night Adams and Victim met." (Docket No. 8-3 at 49). The state court then reviewed the test under West Virginia law for determining whether newly discovered evidence warranted a new trial, concluding that Adams could not meet several of the essential elements.

Having considered the analysis of the state habeas court, the undersigned confirms that both Adams and the victim testified that they first met on the night of the alleged crimes. Certainly, Adams would know if he had a prior or ongoing relationship with the victim. He unquestionably could and would have testified regarding that relationship; particularly, as his defense was based on the theory that the victim alleged rape in retaliation for his refusal to leave his wife. In light of Adams' testimony and the corroborating testimony of the victim, the statement of Mr. Combs is inherently unreliable. Accordingly, the undersigned **FINDS** that the refusal

of the state court to grant a new trial based on this evidence did not meet the criteria of § 2254(d).

### D.    <u>Sentencing and Miscellaneous Grounds</u>

Adams claims that his sentence "shocks the conscience" and constitutes cruel and unusual punishment in violation of the Eighth Amendment. (Docket No. 34-1 at 24). To the contrary, Respondent argues that Adams sentences fell within the statutory range; accordingly, they do not form the basis for a constitutional challenge. Citing *Solem v. Helm,* Respondent emphasizes that "[r]eviewing courts, of course, should grant substantial deference to the broad authority that legislatures necessarily possess in determining the types and limits of punishments for crimes, as well as to the discretion that trial courts possess in sentencing convicted criminals." 463 U.S. 277, 290, 103 S.Ct. 3001, 77 L.Ed.2d 637 (1983).

The undersigned agrees that Adams fails to raise a legitimate constitutional argument in this Court inasmuch as Adams was not sentenced to life imprisonment without the possibility of parole. *See United States v. Wellman,* 716 F.Supp.2d 447 (S.D.W.Va. 2010). In *Wellman,* United States District Judge Thomas E. Johnston reviewed the current status of Eighth Amendment proportionality review, noting that "the Fourth Circuit has consistently and repeatedly held that Eighth Amendment proportionality review 'is not available for any sentence less than life imprisonment without possibility of parole.'" *Id.* at 457-58 (citing *United States v. Malloy,* 568 F.3d 166, 180 (4th Cir. 2009)); *See also Beverati v. Smith,* 120 F.3d 500, 504-05 (4th Cir. 1997); *United States v. Kratsas,* 45 F.3d 63, 67 (4th Cir. 1995); *United States v. D'Anjou,* 16 F.3d 604, 612-13 (4th Cir. 1994); *United States v. Etheridge,* 932 F.2d 318, 323 (4th Cir. 1991); *United States v. Rhodes,* 779 F.2d 1019 (4th Cir. 1985).

Consequently, Adams' challenge on this ground is rejected.

Finally, Adams lists a hodgepodge of other "miscellaneous" grounds for relief, (Docket No. 34-1 at 25-26), none of which is specific or accompanied by "the facts supporting each [such] ground" as required by Rule 2(c)(2) of the Rules Governing Section 2254 Cases. Moreover, many appear to be procedurally barred or defaulted or simply redundant. The court is not charged with the responsibility of wading through Adams' murky pool of claims in an effort to identify a potentially valid one; especially, when Adams is represented by competent counsel and has had ample opportunity to adequately articulate the nature and bases of his claims. "Habeas petitions must meet heightened pleading requirements." *McFarland v. Scott,* 512 U.S. 849, 856 114 S.Ct. 2568, 129 L.Ed.2d 666 (1994). As stated, at a minimum, a habeas petitioner must set forth each alleged ground for relief and identify the factual basis of each individual ground. The undersigned **FINDS** that the "miscellaneous" section of Adams' amended petition (Docket No. 34-2 at 24-25) fails to sufficiently plead additional grounds for relief and, thus, should be dismissed as legally deficient.

## V.    <u>Proposal and Recommendations</u>

The undersigned respectfully **PROPOSES** that the District Court confirm and accept the foregoing findings and **RECOMMENDS** as follows**:**

1. Respondent's Motion for Summary Judgment (Docket No. 41) be **GRANTED**; and

2. Petitioner's Petition and Amended Petitions for Writ of Habeas Corpus by a Person in State Custody (Docket Nos. 1, 4, 34, and 34-1) be **DENIED** and **DISMISSED** with prejudice.

The parties are notified that this "Proposed Findings and Recommendations" is hereby **FILED**, and a copy will be submitted to the Honorable Robert C.

Chambers, United States District Judge. Pursuant to the provisions of 28 U.S.C. § 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and three days (mailing) from the date of filing this "Proposed Findings and Recommendations" within which to file with the Clerk of this Court, specific written objections, identifying the portions of the "Proposed Findings and Recommendations" to which objection is made and the basis of such objection. Extension of this time period may be granted by the presiding District Judge for good cause shown. Failure to file written objections  as indicated shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. *Snyder v. Ridenour*, 889 F.2d 1363 (4th Cir. 1989); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984). Copies of such objections shall be provided to the opposing parties, Judge Chambers and Magistrate Judge Eifert.

The Clerk is instructed to provide a copy of this "Proposed Findings and Recommendations" to the petitioner, the respondent, and all counsel of record.

**FILED:** October 31, 2011.

Cheryl A.  Eifert
United States Magistrate Judge